```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3     UNITED STATES OF AMERICA,

 4                    Plaintiff,        Case No. 11-20129-6
          -v-                           Case No. 11-20066-2
 5
       PAUL ANTHONY DARRAH,
 6
                      Defendant.
 7     _____/

 8                       DETENTION HEARING

 9           BEFORE MAGISTRATE JUDGE R. STEVEN WHALEN
                  United States Magistrate Judge
10          Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
11                      Detroit, Michigan
                        July 23, 2012
12
       APPEARANCES:
13
       FOR THE PLAINTIFF:   ERIC STRAUS
14                          U.S. Attorney's Offie
                            211 W. Fort Street
15                          Suite 2001
                            Detroit, MI 48226
16
       FOR THE DEFENDANT:   PATRICIA MACERONI
17                          Law Offices of Patricia A. Maceroni
                            PLLC
18                          26611 Woodward Avenue
                            Huntington Woods, MI 48070
19

20
              To Obtain a Certified Transcript Contact:
21     Christin E. Russell, CSR, RPR, FCRR, CRR - (248) 420-2720
               Proceedings produced by mechanical stenography.
22       Transcript produced by computer-aided Transcription.

23

24

25
```

```
1                        I N D E X
2
       Detention Hearing                              Page
3
4      Proffer by Mr. Straus                              4
       Proffer by Ms. Maceroni                            9
5      Argument by Mr. Straus                            16
       Argument by Ms. Maceroni                          19
6      Ruling of The Court                               22
7
                      E X H I B I T S
8
       (NONE OFFERED)
9
10
11     CERTIFICATE OF REPORTER                           29
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    Detroit, Michigan

2    July 23, 2012

3    2:16 p.m.

4                        *       *       *

5            THE CLERK:  The Court calls criminal matter 11-20129,

6    Defendant No. 6.  United States of America vs. Paul Darrah.

7            Now, are we talking about two case numbers also?

8            MR. STRAUS:  Yes, we are, your Honor.  But however, I

9    believe Mr. Darrah has -- we have completed his arraignment.

10   Is that correct?

11           MS. MACERONI:  That's correct.  Patricia Maceroni on

12   behalf of Mr. Darrah.  Your Honor, last week we did complete

13   arraignment on both of the indictments.

14           THE COURT:  Okay.

15           THE CLERK:  So we're here just on this --

16           MS. MACERONI:  Detention hearing.

17           THE CLERK:  For both matters or just this one matter?

18           MR. STRAUS:  Both.

19           THE COURT:  I'm just trying to think if there would be

20   a situation where he's detained in one or released on the

21   other.  I guess I can't -- it's an all-or-nothing situation.

22           MR. STRAUS:  Yeah.  I thought about that myself, your

23   Honor.  My sense is that the detention order would trump the

24   release order.

25           THE COURT:  In any event, Mr. Straus, first of all,

DETENTION HEARING - 7/23/12                                    4

```
 1    are we ready to go forward with a detention hearing?
 2              MS. MACERONI:  Yes, your Honor.
 3              MR. STRAUS:  The Government is ready, your Honor.
 4              THE COURT:  And are we going by proffer or by live
 5    testimony?
 6              MR. STRAUS:  Written proffer, your Honor.
 7              THE COURT:  Is that okay, Ms. Maceroni?
 8              MS. MACERONI:  No objection, Judge.
 9              THE COURT:  Go ahead.
10              MR. STRAUS:  Your Honor, I don't know if the Court has
11    received a copy of the Government's written proffer that was
12    filed on July 16th.
13              THE COURT:  I did, and I have read that.
14              MR. STRAUS:  And you have had an opportunity to read
15    that?
16              THE COURT:  I did.
17              MR. STRAUS:  Your Honor, I won't, I won't belabor the
18    point.  I will, I guess, for purposes of the record, just
19    simply kind of use that as an outline.  This is the Court's
20    first dealing with this case in terms of the detention hearing.
21    Needless to say, the Government, in its proffer, has -- by the
22    way, this is a presumption case.
23              Mr. Darrah, as the Court is aware, is charged in two
24    indictments.  The first indictment charges him in multiple
25    counts involving a conspiracy to obstruct justice.  That would
```

1    be in connection with a trial held in 19 -- 2006 before the

2    Honorable Lawrence P. Zatkoff.  He's also charged in criminal

3    No. 11-20129.  Most notably, he is a RICO defendant and he is

4    charged in Count 3, among other counts, with meth distributing

5    -- meth distribution conspiracy.

6           As the Court can see Mr. Darrah, and I will say this,

7    looks are deceiving.  The Government is moving for detention

8    based on risk of flight, danger to the community.

9           As indicated in our proffer, Mr. Darrah is the

10   national vice president of a violent organized crime group,

11   that is the Devils Diciples Motorcycle Club, which is the

12   charged enterprise in the RICO indictment.  He has been in a

13   period -- he has been in a position leadership for some time.

14   He has been the national vice president for over ten years.

15   He's actively participated in the Devils Diciples' criminal

16   activities for an extended period of time.  And he's personally

17   supervised virtually all of the Devils Diciples motorcycle

18   criminal activities, that being second-in-charge.

19          During the course of those conspiracies, the Devils

20   Diciples has distributed a massive amount of methamphetamine,

21   hydrocodone, other drugs.  He's also overseen a pattern of

22   violence, witness intimidation and obstruction of justice,

23   specifically that which is charged in 11-20066.

24          During the time frame that he has been with the club,

25   the Devils Diciples have shot and killed three people in two

```
 1    separate incidents, shot and wounded two people in two separate

 2    incidents, savagely assaulted four people and left them for

 3    dead in the desert, severely beat disabled man, that was just

 4    in January, and broke his jaw in two places.

 5              THE COURT:  Let me ask you a question, stop you for a

 6    minute --

 7              MR. STRAUS:  Yes, your Honor.

 8              THE COURT:  -- and ask you some questions about that.

 9    I know that one or the other defendants is alleged to have been

10    directly involved in the situation with the, with the disabled

11    person.  But in terms of these other situations, the killings

12    and whatnot, what is Mr. Darrah's connection to that?

13              MR. STRAUS:  Well, not only has he been a member of

14    the very club that routinely commits these acts of violence,

15    your Honor, he's been in a leadership role for the last ten

16    years.  And during that last ten-year period, several incidents

17    which are charged in the indictment have occurred, most

18    particularly methamphetamine distribution; that's a ten-year

19    mandatory minimum offense.

20              During 2009, this would be after Mr. Darrah's

21    tracheotomy operation and presumably in the same physical

22    condition that he is in today, the Government was up on a Title

23    III for about seven months.  During that period of time, as the

24    Court can see as indicated in the written proffer, you can see

25    that Mr. Darrah, consistent with his leadership role, directed
```

DETENTION HEARING - 7/23/12

1    others to commit acts of violence, in one particular incident,

2    against a gentleman named Danny Burby, who likewise was a

3    member of the club.  And that's detailed at pages 8 and 9 of

4    the written proffer.  There are some other discussions during

5    that Title III.

6         THE COURT:  Did Burby in fact get assaulted?

7         MR. STRAUS:  He was in fact assaulted, your Honor.

8    And so, in other words, Mr. Darrah's directives to his minions

9    were indeed carried out.  I note he doesn't have much of a

10   criminal record.  However, he is charged with a number of

11   different charges:

12        The conspiracy to violate RICO; conspiracy to

13   distribute 5 grams or more of methamphetamine; distribution of

14   methamphetamine; using a facility in interstate commerce to

15   further an unlawful activity; conspiracy to obstruct justice by

16   witness tampering -- that's a separate incident from the Judge

17   Zatkoff case -- and assault in aid of racketeering.

18        And in the other indictment, he's charged in Counts 1,

19   2 and 3, which respectfully charge conspiracy to suborn perjury

20   and obstruct justice.  I will note that in that indictment, the

21   Court may -- will note that at least one, perhaps two witnesses

22   were threatened.  In fact, the female witness was threatened

23   that if she were not -- if she not to falsely claim ownership

24   of a firearm, that the Devils Diciples -- certain Devils

25   Diciples would take her daughter, hook her on drugs, and

1    essentially make her a prostitute.

2           THE COURT:  Was it Mr. Darrah that made the threat?

3           MR. STRAUS:  No, but he was the leader of that

4    conspiracy, your Honor.  As mentioned, he's facing a ten-year

5    mandatory minimum.

6           In terms of a possible look at the sentencing,

7    sentencing guidelines, I'm just reading here, I see a base

8    offense level for methamphetamine track -- trafficking of 38.

9    He would likely receive at least a two-level enhancement for

10   role in the offense, two-level enhancement for obstruction of

11   justice.  Preliminarily, it looks like Darrah is looking -- Mr.

12   Darrah is looking at a recommended sentence of 360 months to

13   life.

14          As such, and in combination with, and I, and I sense

15   that Ms. Maceroni will note some physical issues, but I think

16   they cut the other way, I think Mr. Darrah, facing that

17   sentence, has every, has every incentive to leave.  Any

18   sentence may very well be a life sentence.  And to the extent

19   he is released, he can certainly return to his capacity in

20   directing the activities of others, engaging in violent acts

21   and other acts consistent with what they are charged with, that

22   is, obstruction of justice and witness tampering in this

23   particular case.

24          Consequently, the Government believes that there are

25   no conditions or combination of conditions that will assure his

```
 1    further appearance, and no combination of conditions that will
 2    assure the safety of the community, particularly witnesses in
 3    this case and the very justice system that we operate under
 4    here in the Eastern District of Michigan.
 5              THE COURT:  Ms. Maceroni?
 6              MS. MACERONI:  Thank you.
 7              Initially, Judge, and I've already tendered a copy of
 8    these to Mr. Straus, I have two exhibits that I would like to
 9    submit on Mr. Darrah's behalf.  The first one is from his
10    primary care physicians at Oakland Primary Care.  His second is
11    a status letter from the ENT physician, Dr. Brandes, who
12    performed the tracheotomy.
13              Before I get into his medical condition, though, I
14    want to say a few things following Mr. Straus's remarks.  First
15    of all, I don't believe that there's any evidence, with all due
16    respect to Mr. Straus, that there's any risk of flight here on
17    behalf of Mr. Darrah.  I think --
18              THE COURT:  I have to tell you, I'm more concerned
19    about the danger to the community.
20              MS. MACERONI:  Okay.
21              THE COURT:  So if you want to focus your comments on
22    that.
23              MS. MACERONI:  I will.  The last specific thing quoted
24    or cited in the written proffer that was filed occurred in
25    2008.  There has been nothing in writing or any allegation that
```

1    Mr. Darrah has done anything specifically since 2008 concerning

2    the Devils Diciples.

3          You know, there's a lot of talk back and forth about,

4    well, he's still in a leadership role, he's still this, he's

5    still that.  There's been nothing brought forward of any recent

6    allegations whatsoever of him directing any type of criminal

7    activity.  The obstruction case that was in front of Judge

8    Zatkoff occurred in 2006, so that's even longer than that.

9          As far as his danger to the community, Judge, now I

10   would like to dovetail into his medical history.  Quite

11   frankly, his medical history has continually deteriorated since

12   he received his tracheotomy a few years ago.

13         Looking at Exhibit No. 1, the first page is a status

14   letter from his doctor, Dr. Defauw.  But before we get into

15   that, I'd like to direct the Court to page 2 of 6 where it

16   indicates that the primary basis for Mr. Darrah's physical

17   problems are a gene mutation, which is a coagulation gene

18   mutation, which necessitates him being on substantial and

19   lifelong doses of coumadin.  The coumadin allows the blood to

20   thin out.  As a result of this gene mutation, he has had three

21   heart attacks and several strokes, the latest being in 2011.

22   The coumadin has got to be monitored.  And now I'll go back to

23   the first page of the report, the blood work monitored so the

24   dosage of his coumadin is correct.

25         Since he's been in the Wayne County Jail in the last

1    ten days, Judge, they keep fluctuating with his coumadin
2    medication level.  Some days they give him five doses --
3         THE COURT:  How long has he been in the Wayne County
4    jail?
5         MS. MACERONI:  I'm sorry?
6         THE COURT:  How long has he been in the Wayne County
7    Jail?
8         MS. MACERONI:  Twelve days, since he was arrested
9    on -- when were they arrested?  July?
10        MR. STRAUS:  July 13th, your Honor.
11        THE COURT:  So what are you saying, he's getting the,
12   he's getting coumadin, but --
13        MS. MACERONI:  He's not getting it regularly.  Also,
14   they keep fluctuating with his coumadin levels.  Some days
15   he'll get five pills, some days he'll get six pills, which
16   according to his physician, is the worst thing they can do with
17   the coumadin level.
18        Secondly, Judge, on page 1 of 6, there's a list of 17
19   medications that he's currently on.  If you subtract the pieces
20   of, like a footwear that he needs and the special inserts that
21   he needs because of his diabetic condition, we're looking at 14
22   medications that he has to take on a daily basis.  He's getting
23   five in the Wayne County Jail.
24        Currently, he's got insulin-dependent diabetes, which
25   sometimes they give him the shot in the morning, sometimes it's

1    in the afternoon.  Again, there's no consistent course of

2    treatment.  He has a liver hemangioma, which necessitates drug

3    treatment.  He's not getting care for that whatsoever.  And

4    then most obviously, Judge, is the tracheotomy, which he got in

5    2007 as a result of the complications of some of these other

6    diseases that he has.

7            The main thing with the tracheotomy is the fact that

8    he needs to keep the trach clean, not only the hole that's

9    going into his chest, but all of the apparatus that surrounds

10   the tracheotomy, the tubes, the collar around his neck, the

11   insert that's inside of his neck.  And his doctor, and that's

12   Exhibit No. 2 that I gave you, specifies that he needs specific

13   care that has to be cleaned daily with peroxide, suctioned

14   daily with a sterile suction tube.  And the tracheotomy tube

15   itself, forget all the other stuff with the oxygen, has to be

16   changed because these things deteriorate.

17           Since he's been incarcerated, they haven't given him

18   any peroxide.  On one day, they gave him a saline solution to,

19   to swipe out the tracheotomy and the tubing.  He hasn't gotten

20   any new tubing in the 13 days that he's been in, or the ten

21   days that he has been in.

22           At home, he has specific sterile packages that have

23   the peroxide, that have everything that he needs to make sure

24   that he's not getting any type of infection in the machines --

25   or in the trach.  He does that twice a day.  He hasn't gotten

1  one sterile type of cleaning kit at any point in time since

2  he's been incarcerated.

3          Both Dr. Brandes and his treating physician at Oakland

4  Primary Care stress the fact that this hole in his neck is a

5  direct conduit to his lungs and his chest and his upper

6  respiratory system, and any infection that gets in will

7  directly attack the lungs.  You know, so it's a critical part

8  of his care.

9          I just don't believe that there's not a set of

10 restrictions or requirements that this Court can't fashion to

11 make sure that he's getting the type of treatment that he needs

12 outside with his doctors, which include weekly blood

13 monitoring.  I mean, the doctor said that if there -- the

14 coumadin levels go up and down, he should have two blood draws

15 a week.

16         He was last seen at Oakland Primary Care on July 10th,

17 and the coumadin levels were suspicious and they ran another

18 blood draw.  I haven't seen the results of those blood tests

19 yet, neither has Mr. Darrah.  And if the coumadin is stable,

20 then he has to go back once a month.  This is a constant

21 critical set of care that needs to be done to make sure that he

22 remains in good health.

23         Additionally, Judge, I would like to put into evidence

24 Pretrial Services' report which indicates that an unsecured

25 bond would be fine.  I mean, we're talking about a gentleman

1    whose last criminal offense was a misdemeanor in 1997 for the

2    possession of marijuana.  He's had no violent history

3    whatsoever.  He's a lifelong resident of this district.  He has

4    a 13-year-old --

5           THE COURT:  It does say there were threats that were

6    apparently picked up on Title III --

7           MS. MACERONI:  I'm sorry?

8           THE COURT:  There were threats that were picked up on

9    Title III wiretaps.

10          MS. MACERONI:  People --

11          THE COURT:  Back in 2008 and I think 2009.

12          MS. MACERONI:  Sure.  Sure.  Just by way of example,

13   Eric Smith, Macomb County Prosecutor, was picked up on a

14   voicemail message machine threatening the gentleman who's

15   running against his brother in a county commissioner race.  I

16   mean people say --

17          THE COURT:  If Eric Smith is in front of me, then I'll

18   deal with him.

19          MS. MACERONI:  People say stupid things on the phone,

20   you know, honestly.

21          THE COURT:  Let me ask you a question.  Let's assume

22   that your client, or any individual, could be deemed a

23   dangerous individual, could be deemed dangerous to other people

24   if he were released, but that individual also has very serious

25   medical problems.  Is that -- is the, the lack of treatment or

1   the inadequacy of treatment enough of a reason to grant bond to

2   somebody that would otherwise be considered a danger?

3          MS. MACERONI:  I believe so.

4          THE COURT:  Or is the remedy -- I mean, anybody that's

5   incarcerated has a due process right to medical treatment.

6          MS. MACERONI:  But it's the quality of that medical

7   treatment, Judge.

8          THE COURT:  But I mean, does the fact that he gets

9   medical treatment on the outside address the question of

10  whether there are conditions that could ensure that he's not

11  going to be a danger to another person?

12         MS. MACERONI:  I believe there are certain conditions

13  that this Court could impose so that if --

14         THE COURT:  Give me an example.

15         MS. MACERONI:  Well, he can't, he can't talk on the

16  phone.  I mean, these allegations that have been placed forward

17  in the proffer indicate that he's somehow directing all of this

18  stuff using a phone.  Take away the phone.  Put him on an

19  electronic tether so that they know he's under house arrest,

20  other than when he has to go to his doctor's appointments.

21  There's certainly, in today's day and age, enough surveillance

22  equipment and enough type of electronic monitoring, GPS, you

23  know, whatever the Court feels is, is good enough that will

24  monitor where he is and what he's doing 24 hours a day.  And

25  he's more than amenable to that.

1          He's the sole care provider for his 13-year-old son.

2    Again, he's got strong family support in the community.  Four

3    of his nieces are in the courtroom today and are willing to do

4    whatever this Court directs to make sure he does as well.

5          THE COURT:  Where -- where does he live?  Who does he

6    live with?

7          MS. MACERONI:  He lives in Macomb Township.  He lives

8    with his son, Jack.  He also lives with --

9          THE COURT:  Jack is the 13-year-old?

10         MS. MACERONI:  The 13-year-old.  And he lives with

11   Jennifer Cicola, who is also named in the indictment.  She's

12   defendant number -- she's at the end of the list.  And they've

13   been together for 17 years.  They've got a common law marriage,

14   and they are the parents of Jack.  So, but he's been, he's been

15   at that Macomb Township address since 2009 when I was initially

16   appointed to represent him when the criminal complaint was

17   first brought forth.

18         MR. STRAUS:  Your Honor, if I can just --

19         THE COURT:  Yeah, please.

20         MR. STRAUS:  I appreciate the medical conditions that

21   Mr. Darrah has, but when we look at his past history, it

22   apparently didn't stop him from committing criminal behavior.

23   He's had this trach operation for some time.  And post-trach

24   operation, he was able to direct others to carry out, indeed

25   did carry out an assault on Danny Burby.

1            The stakes are very high in this case.  It strikes me

2     that these sympathy factors do not diminish the risk of flight

3     or the danger to the community considering that he is, he is

4     not a strong-arm person.  He is a leader and he directs others.

5            In terms of the risk of flight, it strikes me that if

6     they are as significant as they sound to be, although I am not

7     a physician, one might conclude that upon release, he should,

8     he should be the first one to get out of Dodge, because any

9     sentence imposed in a case of this magnitude with the evidence

10    that he is facing will be a life sentence.  And there is really

11    no reason whatsoever for him to stick around.

12            MS. MACERONI:  Judge, can I respond to that?

13            THE COURT:  Well, hang on.  Hang on.  I'll give you a

14    chance.  I mean, I suppose one reason for him to stick around

15    is to continue getting medical treatment.  Apparently he's on

16    continuing care.

17            MR. STRAUS:  Or to continue helping others thwart the

18    criminal justice system.

19            THE COURT:  I understand.  Let me ask another

20    question, and I think I'm talking about Mr. Darrah here.  I

21    believe that there was a -- well, first of all, the conspiracy

22    in this particular case spans what, 2005 through 2009 I think?

23            MR. STRAUS:  Which conspiracy, your Honor?

24            THE COURT:  The conspiracy of 20066.

25            MR. STRAUS:  Yes, correct.

1       THE COURT:  Hang on a second.  I want to look at

2  something in the Pretrial Services' report.

3       MR. STRAUS:  Your Honor, if I may?

4       THE COURT:  One second.

5       MR. STRAUS:  Okay.

6       THE COURT:  I want to make sure I'm not confusing one

7  defendant with the other.  Are these two cases that we're here

8  on today his only Federal -- were there any prior Federal

9  convictions?

10      MS. MACERONI:  No.

11      MR. STRAUS:  No, your Honor.

12      THE COURT:  Okay.  Okay.  Fine.  That answers my

13  question.

14      Go ahead.  You had another point you wanted to make?

15      MR. STRAUS:  I forgot it.

16      THE COURT:  I know how that happens.

17      MR. STRAUS:  Your Honor, I appreciate, I appreciate

18  the concern over medical conditions.  And I will just say by

19  way of background that of the 41 defendants, the United States

20  did not ask for detention on everyone, notwithstanding their,

21  their membership in the club.

22      Those people that were -- that the Government did move

23  for temporary detention and ultimately full detention, those

24  were carefully chosen based on their backgrounds, either as low

25  level violent persons in their individual capacity, or people

1    such as Mr. Darrah, who have the capacity by way of reputation,

2    his position within the organization to carry out acts of

3    violence through others.

4          THE COURT:  One other factual question.  The killings

5    that you spoke of and the, the other physical, physically

6    violent actions, those occurred during the course of this

7    conspiracy?

8          MR. STRAUS:  That's correct, your Honor.

9          THE COURT:  Okay.

10          MR. STRAUS:  Most recently would be the, what we have

11    been referring to as the Box Canyon beatings where five members

12    of the Devils Diciples who apparently were on the outs with

13    other members of the Devils Diciples were beaten and left for

14    dead in the desert in Arizona.

15          THE COURT:  And when did that happen?

16          MR. STRAUS:  I believe that was in 2003, your Honor.

17          THE COURT:  Okay.

18          MR. STRAUS:  Which would have been within the time

19    period of Mr. Darrah's membership in the DDMC, as well as

20    during a portion of the time he was the leader.

21          MS. MACERONI:  Judge, if I can --

22          THE COURT:  Did you have another point you wanted to

23    make?

24          MS. MACERONI:  Yeah.  As to the risk of flight, you

25    know, in 2009 when the complaint was initially filed, Matthew

1   Schneider was the AUSA who was handling the case.  And he was

2   adamant in speaking with me.  And of course, I relayed this to

3   Mr. Darrah, the indictment is coming down imminently.  If your

4   client wants to talk to us, make sure that, you know, he gets

5   in front of this because --

6           THE COURT:  Did he appear -- did your client appear in

7   2009 --

8           MS. MACERONI:  No.

9           THE COURT:  -- on the complaint?

10          MS. MACERONI:  The complaint was dismissed.

11          THE COURT:  He, he never appeared in that complaint?

12          MS. MACERONI:  Never appeared.

13          THE COURT:  Okay.

14          MS. MACERONI:  It was adjourned a few times, you know,

15   the preliminary exam was adjourned a few times and then

16   everything was ultimately dismissed, with the under --

17          THE COURT:  He never did an initial appearance in the

18   complaint?

19          MS. MACERONI:  No.

20          THE COURT:  Okay.

21          MS. MACERONI:  With the under -- you know, I mean, he

22   was contacted --

23          THE DEFENDANT:  I was here.

24          MS. MACERONI:  Oh, you were here once?

25          THE DEFENDANT:  I was here.  I was bonded out.

```
 1              MS. MACERONI:  He was bonded out.  I apologize.
 2   That's right, because that's why I got appointed.
 3              THE COURT:  That was Magistrate Judge Morgan, I think.
 4              MS. MACERONI:  I'm not -- I can't remember, Judge.
 5              THE COURT:  But in any event, that complaint was
 6   dismissed and when the indictment came down, it was sealed
 7   initially, I think.
 8              MR. STRAUS:  This indictment.
 9              THE COURT:  This indictment, yea.
10              MR. STRAUS:  Both, actually, both indictments.
11              THE COURT:  Okay.
12              MR. STRAUS:  But that was several years later.
13              THE COURT:  Right.
14              MS. MACERONI:  Which is my point.  I mean, in 2009, he
15   was being told by the Government, you know, we're coming after
16   you.  The indictment is imminent, even though there was an
17   understanding that there wasn't going to be much done on the
18   complaint.  If he's going to run, that's when he's going to
19   run, when he understands -- when he first knows that he's under
20   the, the supervision of the Government or, you know, the
21   Government believes that he's the leader of this horrible
22   organization.  He didn't run then.  He didn't run in 2010,
23   2011, and we're more than half way through 2012.  His entire
24   family is here.  Medically, he can't run.  I mean, he wouldn't
25   have the oxygen supply to run.
```

1          I know these are serious allegations.  He certainly

2    understands they are serious allegations.  But if he was going

3    to run, he had three and a half years to do it and he didn't.

4          So I don't believe that there's any evidence, quite

5    frankly, of a risk of flight whatsoever, no matter how much

6    time he is looking at.  And we're very long away from figuring

7    out the sentencing guidelines in this matter.  This is a

8    detention hearing.

9          THE COURT:  Okay.

10         MS. MACERONI:  So based on everything, based on, you

11   know, the significant risk of infection, and serious

12   complications as a result of his physical infirmities, if the

13   Government is concerned about his access to a telephone, he'll

14   give up any access to a telephone and he will abide by whatever

15   conditions.

16         THE COURT:  That's a, that's a real hard condition to

17   enforce.

18         MS. MACERONI:  But it's one that he's willing to

19   undergo so that he can get his necessary medical care and spend

20   whatever time he has remaining with his 13-year-old son.

21         THE COURT:  Okay.  All right.  This is a -- this is a

22   tough case, because certainly if you look at the allegations in

23   the indictment involving the whole organization, there's some

24   pretty nasty stuff going on.  It's an allegation, I understand,

25   but there's some, the Government pointed out in its memorandum,

```
1    there's some fairly significant evidence in toto involving the
2    organization.  Now, the allegation is that Mr. Darrah is the
3    vice president of this organization, so therefore, he has a
4    supervisory role in directing these things.
5           What I'm going to do, and I want to be real clear
6    about what I'm going to do and why I'm going to do it, I am
7    going to grant bond, and I'm going to put some stringent
8    conditions.  And I want to be clear, again, why I'm doing this.
9           I am concerned -- well, first of all, let me talk, it
10   is a presumption case.  This is an indictment, so obviously
11   it's probable cause.  So the presumption is factored in, it is
12   a rebuttable presumption.
13          Now, in terms of the risk of flight, I indicated
14   earlier that I was less concerned about that.  And Ms.
15   Maceroni, I think your, your point is well taken that he was
16   aware back in 2009 what was coming down the pike here and what
17   was happening.  He didn't flee.
18          Secondly, it's, it's clear that he's got some serious
19   medical, medical conditions that need to be addressed.  And
20   he's got incentive to stay here and deal with those, because
21   these are life-threatening situations that require ongoing
22   care, requires medication, requires care for the tracheotomy,
23   et cetera.  And I don't think a person that's on the run, so to
24   speak, is going to be able to get that level of care.
25          As far as the possible sentence he might be looking
```

1    at, you know what?  If he gets sentenced, it may end up being a

2    life sentence.  But I've mentioned this before in this court.

3    There appears to be, based on studies that have been done, not

4    a real big correlation between the amount of time somebody is

5    looking at and whether they are going to, whether they are

6    going to show up.  So there are conditions I could set to

7    assure against the risk of flight.

8            I'm more concerned about the, given the allegations in

9    the complaint, given the statements that Mr. Darrah was heard

10   making on the Title III's, and yeah, I don't think those

11   statements are just blowing smoke.  I think that the guy was

12   directing punishment.  Okay.  Given this -- so that concerns

13   me.

14           Given that, and of course, the, the evidence that he

15   would have directed or been involved in the earlier situations,

16   what you called the Box Canyon incident or the killings is

17   more, at this point, based on what I've heard, more indirect

18   and is more based on his leadership role.  But the fact is

19   these, these incidents that directly involve him that concern

20   me were back in 2008 and I think maybe in 2009, and of course,

21   that's when the complaint was filed.

22           Since that time, I don't see that there's been any, at

23   least no evidence of any further activity, either directly, or

24   threatening people, or actually assaulting people.

25           I don't think that Mr. Darrah himself, given his

1   physical condition is personally in a position to go out and do

2   any damage to anybody.  I suppose he could still use a gun.

3   But the point is that there's no, there's no, between 2009 --

4   2008, 2009 and now, I don't see any indication.  Nonetheless,

5   it does concern me.  But there are conditions I could set that

6   would assure, reasonably assure, they are never 100 percent

7   assure of anything, but reasonably assure that he's going to

8   behave himself.

9          And again, I'm not bound by what Magistrate Judge

10  Morgan did back in 2009.  And I don't know, obviously, what she

11  was aware of at that time in terms of the activity.

12         MR. STRAUS:  She was not aware of a lot of this, your

13  Honor.

14         THE COURT:  Yeah.  I mean, certainly the Government

15  was aware of what was going on.

16         And then finally, the final sort of piece of puzzle is

17  I do have a recommendation from Pretrial Services that suggests

18  that there are conditions that could be set.  In fact, I'm

19  going to set more stringent conditions than are recommended by

20  Pretrial Services.  And again, I'm not bound by what Pretrial

21  Services recommend, but I pay attention to it.

22         So, I'm going to set bond at, as the amount as

23  recommended, $10,000 unsecured, unsecured with the following

24  conditions.

25         Let me say one more thing.  And I asked Ms. Macaroni

```
 1   what if someone is really a direct danger, but yet they have
 2   this life-threatening medical condition they are not getting
 3   treatment for.  Is that sufficient in and of itself to get
 4   bond?  I don't think it is.  But it's a factor I am considering
 5   in the totality of circumstances, because right now,
 6   notwithstanding the strength of the case, Mr. Darrah is
 7   presumptively innocent.  And obviously he's not getting the
 8   complete absence of care in Wayne County Jail.  But given this
 9   proliferation of medical problems that he has, I'm concerned
10   that he's not going to get adequate care pre-trial in the
11   event.
12           Okay.  $10,000 unsecured with the following
13   conditions:
14           He will report as directed to Pretrial Services;
15   restrict his travel to the Eastern District of Michigan.  I'm
16   going to order electronic monitoring, GPS monitoring with a
17   curfew as directed by Pretrial Services.  That curfew will
18   allow for medical visits, obviously visits with counsel for
19   purpose of preparing a defense.
20           He's to have no contact with any witnesses, any
21   potential witnesses, or any co-defendants, with the exception
22   of Jennifer Cicola, I think it's pronounced.
23           MR. STRAUS:  Cicola.
24           THE COURT:  They have a child together, so I'm not
25   going to order that he have no contact with the mother of their
```

1   child.  But that's the only exception.  There's to be no

2   contact, and that means no telephone calls, no personal

3   contact, no communication at all, except through your lawyer,

4   as necessary to prepare your defense.

5          You're not to possess any firearms, destructive

6   devices or other dangerous weapons.

7          You are not to possess any illegal drugs.  You are not

8   to possess any controlled substances, unless they are

9   prescribed by a licensed medical provider.

10          Submit to drug testing and/or treatment as directed by

11   Pretrial -- well, if it's one time, if it's negative, it will

12   be discontinued.  If it's not, further testing or treatment as

13   directed by Pretrial Services.

14          You will reside at the address you've given to

15   Pretrial Services.

16          Does he have a passport?

17          MS. MACERONI:  No.

18          THE COURT:  Well, you're not to apply or obtain a

19   passport or an enhanced driver's license.  Do you have -- does

20   he have an enhanced driver's license?

21          MS. MACERONI:  No.

22          THE COURT:  Okay.  I think that takes care of it.  As

23   I said, I've gone a bit beyond what was recommended by Pretrial

24   Services.

25          Mr. Darrah, I want to caution you that if you fail to

```
 1    follow these conditions in any respect, you have a big problem
 2    because your bond will be revoked.  You will go to Wayne County
 3    Jail.  And you know what your medical situation is better than
 4    I do and what the consequences of that will be.
 5            You could also be charged with an additional offense
 6    that could get you an additional up to ten years over and above
 7    anything you might get on this case.  It can be treated as
 8    contempt of court.  It's just a world of problems that fall on
 9    your shoulders if you don't comply with these conditions.
10            Do you have any questions about the conditions?
11            THE DEFENDANT:  No, sir.
12            THE COURT:  Okay.  If you do, talk to your attorney,
13    talk to the Pretrial Services' officer.  But again, it's
14    imperative that you comply with these conditions.
15            Anything else for the record?
16            MR. STRAUS:  Yes, your Honor.  We appreciate the
17    Court's ruling.  The Government will elect to exercise its
18    right to appeal to the district court.  I would ask that the
19    Court hold in abeyance Mr. Darrah's release until resolution by
20    the district court.
21            THE COURT:  Okay.  This is -- who is the district
22    judge in this?
23            MR. STRAUS:  Judge Cleland.
24            THE COURT:  Judge Cleland.  Okay.  Is he in the
25    building today?  He is in the building today.
```

DETENTION HEARING - 7/23/12                           29

```
 1            I'll stay this order until five o'clock p.m., or until

 2   further order of Judge Cleland.

 3            MR. STRAUS:  Thank you, your Honor.

 4            THE COURT:  Okay.  Thank you.

 5

 6            (Proceedings adjourned at 2:54 p.m.)

 7                        *       *       *

 8

 9                   CERTIFICATE OF REPORTER

10            As an official court reporter for the United States

11   District Court, appointed pursuant to provisions of Title 28,

12   United States Code, Section 753, I do hereby certify that the

13   foregoing is a correct transcript of the proceedings in the

14   above-entitled cause on the date hereinbefore set forth.

15

16

17            __s/ Christin E. Russell__

18            CHRISTIN E. RUSSELL, FCRR, CRR, RPR, CSR

19                Federal Official Court Reporter

20

21

22

23

24

25
```