UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

                Plaintiff,

                                        **HONORABLE ROBERT H. CLELAND**

        v.                              **No. 11-20066-2** & **11-20129-6**

**PAUL ANTHONY DARRAH,**

                Defendant.
_____/

**APPEAL OF BOND ORDER HEARING**

**Monday, July 23, 2012**

Appearances:

Eric M. Straus                  Patricia A. Maceroni
U.S. Attorney's Office          Law Offices
211 W. Fort Street, #2300       26611 Woodward Avenue
Detroit, Michigan  48226        Huntington Woods, MI  48070
(313) 226-9100                  (248) 541-5200
  On behalf of Plaintiff          On behalf of Defendant

                    -    -    -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan  48226*
*(313)965-4401 · ward@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

*Appeal of Bond Order Hearing*
*Monday, July 23, 2012*

**I   N   D   E   X**

Proceedings                                                     Page

Argument by Mr. Straus  ...........................4

Argument by Ms. Maceroni  .......................10

Argument by Mr. Straus  ........................21

Ruling of the Court ............................22

Certification of Reporter ......................25

-    -    -

*11-20066-2; U.S.A. v. Darrah*

*Appeal of Bond Order Hearing*
*Monday, July 23, 2012*

3

```
 1                              Detroit, Michigan
 2                              Monday, July 23, 2012
 3                              4:20 p.m.
 4                         -   -   -
 5          THE CLERK:  Calling Case Number 11-20129,
 6   Defendant 6, and Case Number 11-20066, Defendant 2,
 7   United States v. Paul Anthony Darrah.
 8       Counsel, will you please state your appearances for the
 9   record.
10          MR. STRAUS:  Yes.  Good afternoon, Your Honor.  For
11   the record, Eric Straus on behalf of the United States.
12          MS. MACERONI:  Good afternoon, Your Honor.
13   Patricia Maceroni on behalf of Paul Darrah, who is present and
14   seated to my left.
15          THE COURT:  Okay, noted.  The defendant's presence is
16   noted, of course.  He is currently in custody.  The question is
17   his status with respect to release or detention, and I
18   understand that the magistrate judge handling the arraignments
19   this afternoon would admit him to a $10,000 unsecured bond.  I
20   think that's correct, in any event.
21          MR. STRAUS:  That's correct, Your Honor.
22          THE COURT:  And Mr. Straus for the Government seeks a
23   review, seeks an appeal of that determination or the substance
24   of that determination.
25          MR. STRAUS:  That's correct.
```

*11-20066-2; U.S.A. v. Darrah*

*Appeal of Bond Order Hearing*
*Monday, July 23, 2012*

4

1           **THE COURT:**  And I then ask what you wish to present.

2           **MR. STRAUS:**  Thank you, Your Honor.

3      Your Honor, I don't know if the Court has had an

4  opportunity to review the pleading entitled Government's

5  Written Proffer in Support of its Request for Detention Pending

6  Trial.

7           **THE COURT:**  I have.

8           **MR. STRAUS:**  That has -- with some oral

9  supplementation, that was primarily the basis of the

10  Government's request.  I will just supplement that with some

11  additional argument.

12      As the Court is aware from a review of that document,

13  Mr. Darrah is the national vice president of the Devil's

14  Disciples Motorcycle Club.  That is the entity which has been

15  charged as an enterprise for purposes of Title 18 United States

16  Code 1961, that is, a Rico enterprise.  He is a long-time

17  member of the Devil's Disciples.

18      It's probably worth mentioning that, of the 41 defendants

19  indicted on the 129 Rico indictment, the Government has

20  requested detention on only 13, in addition to two out-of-state

21  defendants.  Obviously Mr. Darrah is one of those individuals.

22      The basis for the Government's motion for detention is

23  two fold.  The Government believes he is a risk of flight and a

24  danger to the community, notwithstanding the Pretrial Services

25  recommendation.  I suppose the Court can take judicial notice

1    of the fact that I guess in the upside-down world of organized

2    crime and gangs it is often the leaders of the organization who

3    seek to insulate themselves from criminal liability who are

4    oftentimes the most dangerous by virtue of their leadership

5    roles and not necessarily, for lack of a better term, their

6    leg-breaking abilities.

7        Obviously Mr. Darrah has some physical infirmities that

8    I'm sure will be brought to the Court's attention.  However, it

9    is worth noting that, in terms of his current condition, which

10   I believe is termed a trachea -- or trachea operation, it is

11   noteworthy that some of the conversations that the Government

12   has noted in the written proffer were engaged in after

13   Mr. Darrah's operation.  So, in other words, he is not

14   incapable of carrying out and continuing to carry out his

15   leadership role in directing the activities to commit acts of

16   violence.

17       I would also note that Mr. Darrah is a defendant in the

18   other indictment wherein several individuals are charged with

19   conspiring to suborn perjury and obstruct justice in the 2006

20   trial before the Honorable Lawrence P. Zatkoff, United States

21   District Judge.  I will proffer to the Court that Mr. Darrah's

22   role was to coach and rehearse the proposed testimony of the

23   two witnesses who were to appear before Judge Zatkoff.  One was

24   called by the defense.  The other, recognizing that it was

25   probably fairly implausible testimony, was called by the

1   Government as a rebuttal witness.

2        I take it by all accounts -- John O'Brien was the

3   A.U.S.A. -- by all accounts it effectively neutralized that

4   testimony, but nevertheless it was an example of this criminal

5   enterprise actually successfully putting on perjured testimony,

6   not in state court, but rather in federal court, where the

7   stakes were not that high.  It was a felon in possession case,

8   924(c).

9        Here the stakes are very high, and when one considers in

10  terms of predictive analysis, in terms of what people will do

11  in terms of risk of flight or danger to the community,

12  oftentimes the best factors that we can look to are past

13  history.  Again, Mr. Darrah is a leader in this organization,

14  has a reputation for violence.  Indeed, the pattern of

15  racketeering alleged in the conspiracy to commit Rico had

16  multiple instances of violent acts, including murder.

17       If he were to be released, the Government could well

18  imagine that, consistent with his prior behavior, he would be

19  in a position to lead, rally the troops, and mount what would

20  probably be another effective course of conduct entitled to

21  intimidate and threaten witnesses and/or putative witnesses.

22  That is the Government's concern.

23           **THE COURT:**  There are apparently troops to be

24  rallied; that is to say, there are unindicted members of the

25  organization?

*Appeal of Bond Order Hearing*
*Monday, July 23, 2012*                          7

1         **MR. STRAUS:**  That is correct, Your Honor.

2         **THE COURT:**  In the world, in the community?

3         **MR. STRAUS:**  That's correct, in multiple states.

4         **THE COURT:**  So it's larger than a 40-some person

5   entity?

6         **MR. STRAUS:**  That's correct.

7         **THE COURT:**  According to your investigation?

8         **MR. STRAUS:**  That's correct.

9         **THE COURT:**  How much larger?

10        **MR. STRAUS:**  I believe that the Devil's Disciples

11  currently have about 150 members nationwide.  It's not terribly

12  large, but --

13        **THE COURT:**  So about two-thirds of them remain

14  unindicted?

15        **MR. STRAUS:**  That is correct.

16    And that was the point I wanted to make is, when assessing

17  some of the defendants in this case, we have asked the judicial

18  officers to look at their potential for danger to the community

19  in an individual capacity, in other words, foot soldiers.  In

20  other instances, such as this defendant, you really have to

21  take a look at the danger to the community in terms of

22  collectively the organization and this individual's ability,

23  again, to lead the troops.

24    Accordingly, we ask that the Court detain Mr. Darrah, of

25  all of the defendants, particularly Mr. Darrah and other

*11-20066-2; U.S.A. v. Darrah*

*Appeal of Bond Order Hearing*
*Monday, July 23, 2012*

8

1    leaders, because of the belief by the Government there are no

2    conditions or combination of conditions that will assure the

3    safety of the community or, as I will talk about in a second,

4    his further appearance.

5        I know he has some health problems.  I think, apart from

6    the sympathy factor, that weighs in favor of detention.

7        In terms of the sentence, the potential guideline sentence

8    in this case is I guess --

9            **THE COURT:**  You said in your brief it was 360 to

10   life.

11           **MR. STRAUS:**  It's significant.  Anything less could

12   very well be a life sentence, and as I mentioned to the

13   magistrate judge, Mr. Darrah certainly would be someone that

14   one would expect if released to get out of Dodge because

15   there's very little the Government could imagine in terms of

16   why he would stay to face these charges, particularly

17   considering the quantum of proof that the Government has

18   maintained that it has in this particular case.

19           **THE COURT:**  Is this a case described in Subsection F1

20   of 3142, in other words, a detention case, a presumption of

21   detention case?

22           **MR. STRAUS:**  It is a presumption case, Your Honor.

23           **THE COURT:**  And the structure then of the Court's

24   analysis ordinarily would begin with the -- some sort of

25   acknowledgment of the apparent strength of the evidence, the

*Appeal of Bond Order Hearing*
*Monday, July 23, 2012*

9

1    defendant's background as revealed through the Pretrial

2    Services initial report, and an observation, I would think,

3    that the Court presumes that detention is appropriate, that is,

4    that no condition or combination of conditions would be

5    sufficient to assure the community's safety or Defendant's

6    response to Court requirements.

7              **MR. STRAUS:**  That's correct, Your Honor.

8              **THE COURT:**  And then it becomes the Defendant's,

9    one would say, obligation perhaps to present something that

10   might rebut the presumption?

11             **MR. STRAUS:**  That's correct, Judge.

12             **THE COURT:**  I don't think it ever becomes the

13   Defendant's burden of proof though, does it, under the

14   circumstances under 3142?

15             **MR. STRAUS:**  I believe it is a burden-shifting

16   mechanism in terms of presumptions mechanically.

17             **THE COURT:**  So the Defendant is expected to present

18   something that would be --

19             **MR. STRAUS:**  Rebut the presumption.

20             **THE COURT:**  Yes, sufficient.

21             **MR. STRAUS:**  To overcome it, I guess would be a

22   better word.

23             **THE COURT:**  And to persuade the Court that a

24   condition or combination of conditions may be sufficient to

25   ensure appearance and to reassure the Court about safety of the

1    community, right?

2              **MR. STRAUS:**  That's correct, Your Honor.

3              **THE COURT:**  You have wire taps apparently?  That's

4    apparent in your brief.

5              **MR. STRAUS:**  Yes.  Mr. Darrah was the subject of

6    electronic surveillance for about six or seven months, if I

7    recall correctly.

8              **THE COURT:**  And the statements that are attributed to

9    him are transcribed from overheard conversations that are on

10   it?

11             **MR. STRAUS:**  That's correct, Your Honor.

12             **THE COURT:**  In which his voice was identified as the

13   speaker?

14             **MR. STRAUS:**  That's correct.  In fact, he

15   self-identifies in many conversations as "Pauli."

16             **THE COURT:**  I don't have any further questions at

17   this point, Mr. Straus.

18             **MR. STRAUS:**  Thank you.

19             **THE COURT:**  Ms. Maceroni.

20             **MS. MACERONI:**  Thank you, Judge.

21             **THE COURT:**  Good afternoon.

22             **MS. MACERONI:**  Good afternoon.

23             **THE COURT:**  What would you like to present?

24             **MS. MACERONI:**  Your Honor, I presented downstairs

25   two exhibits, medical reports, one from the Oakland Primary

 1  Care, which is Mr. Darrah's primary care physician, and then

 2  one letter specifically from the surgeon who conducted the

 3  tracheostomy on him, if I could present those.

 4         **THE COURT:**  I think you could probably just proffer

 5  the substance of the medical situation.  I would imagine

 6  offhand Mr. Straus probably would be willing to agree that it's

 7  a correct summation of his circumstances.

 8         **MS. MACERONI:**  Okay.  So the Court doesn't want to

 9  review these?

10         **THE COURT:**  Tell me what is significant about them,

11  and I'm sure Mr. Straus will agree.

12         **MS. MACERONI:**  Okay.

13         **THE COURT:**  Extensive medical records, I don't know

14  how extensive they are, but just tell me what's going on.  He

15  has had a tracheostomy?

16         **MS. MACERONI:**  Tracheotomy, yes.

17         **THE COURT:**  Tracheotomy.

18         **MS. MACERONI:**  Yes.

19     Before I get into his medical records it may make more

20  sense, as far as I'm concerned, with the Court's permission, to

21  deal first with the risk of flight argument that Mr. Straus

22  ended with.

23     The Court, I'm sure, is aware, but I think it bears

24  repeating, that the Devil's Disciples first came to the

25  attention of the federal authorities back in 2009.  Mr. Darrah

1   was named in a criminal complaint.  He appeared in District

2   Court.  The complaint was ultimately dismissed with the

3   understanding from the A.U.S.A. who was then handling the case,

4   Matthew Schneider, that an indictment would be forthcoming, and

5   if Mr. Darrah wanted to get in front of these criminal

6   allegations, the sooner he came in the better.

7         And that corresponds time wise especially when you look at

8   the phone conversation that's referenced in the proffer from

9   the Government because the last time that Mr. Darrah is caught

10  as a result of the Title III wire tap is I believe in September

11  of 2008 going back and forth with this one other alleged member

12  of the Devil's Disciples.

13        Nothing happened in 2009, nothing occurred in 2010, 2011,

14  and we are more than halfway through 2012 until the indictments

15  were unsealed and everyone was arrested approximately 10 days

16  ago.  If my client was going to run, Your Honor, I would submit

17  that he would have run in 2009 when he was told by the

18  Government that the indictments were coming down.  Quite

19  frankly, he is a very low risk of flight.

20        **THE COURT:**  What was the complaint as revealed to him

21  at that time?  What did it charge?

22        **MS. MACERONI:**  If I can recall, it was Devil's

23  Disciples, it was drug delivery, conspiracy.  There were maybe,

24  I want to say, 10 or 12 individuals named in the complaint.

25        **THE COURT:**  So drug distribution?

1          **MS. MACERONI:**  Drug distribution, the Devil's

2    Disciples.

3          **THE COURT:**  Well, that's not a crime.  What crime was

4    alleged in the complaint?

5          **MS. MACERONI:**  Conspiracy.

6          **THE COURT:**  Drug distribution, conspiracy.

7          **MS. MACERONI:**  Drug distribution and conspiracy, as

8    well as acts of violence, if I recall correctly.

9          **THE COURT:**  Charged as a crime or is that part of the

10   conspiracy?

11         **MS. MACERONI:**  I wish I had it in front of me, Judge.

12   I just don't know.

13         **THE COURT:**  Mr. Straus, are you aware of --

14         **MR. STRAUS:**  Your Honor, I believe Mr. Darrah was

15   charged with use of a communication facility during the course

16   of a drug transaction.  That's a four-year felony.  I don't

17   believe he was charged with anything like he's charged now.

18         **MS. MACERONI:**  He may be right.  I don't remember,

19   quite frankly.

20         **THE COURT:**  Okay.

21         **MS. MACERONI:**  But I do know in discussing the matter

22   with Mr. Schneider, who was the A.U.S.A. in charge of the case

23   at the time, that this was like the beginning of their

24   investigation and that the Devil's Disciples were going to go

25   down, quote-unquote.  There had been searches of the clubhouse.

1    There had been undercover hand-to-hand buys.  I mean, it was in

2    the process as these things typically do go.

3        The risk of flight is quite low, not only because he's

4    been here for the past three and-a-half, four years.  He's

5    maintained the same residence.  He's never moved.  He's never

6    even changed his phone number.  He has a thirteen-year-old son

7    that he takes care of with his wife, his common-law wife of

8    seventeen years.

9        He has strong family ties to this community.  He has been

10   a lifelong resident of the Eastern District of Michigan.  He

11   has several family members here in the courtroom today with him

12   that have sat through all of the proceedings this afternoon.

13       You know, quite frankly, Your Honor, his medical condition

14   does not behoove him to be someone to go out on the lamb.  With

15   the Court's permission, now I will get into some of the medical

16   conditions.

17       He has been treated for the past twelve years at Oakland

18   Primary Care facility primarily for a gene mutation which

19   affects his ability -- for his blood to coagulate.  As a result

20   of that mutated gene that affects his blood, he has

21   undergone -- suffered three heart attacks as well as several

22   strokes, the last stroke being in 2011.

23       He is under constant care by the Oakland Primary Care

24   physicians because there is no cure whatsoever for this gene

25   mutation.  The only course of treatment is, of course, of

1    Coumadin, which must be monitored by regular blood tests.  At a

2    minimum he has to see the Oakland Primary Care physicians once

3    a month to make sure that the dosages remain level in his

4    system.  His physician is quite concerned with his

5    incarceration anywhere, let alone the Wayne County Jail, that

6    Coumadin puts him at a risk for hemorrhage if there is any type

7    of altercation, and not just a physical altercation with

8    another inmate, but perhaps he falls over or falls down.

9    Coumadin puts him at an increased risk of internal bleeding.

10        Oakland Primary Care has him on no less than 14 different

11   medications, for insulin-dependent diabetes, Coumadin, heart

12   medication, as well as the medication that he needs to try and

13   cut down the risk of infection because with a tracheotomy he

14   has a hole in his neck, which goes directly into his upper

15   respiratory system.

16        Of those 14 medications, he's getting five at the Wayne

17   County Jail.  The Wayne County Jail, in the 12 days that he has

18   been incarcerated there, has not been able to get him on a

19   constant dose of Coumadin.  One shift will give him five pills

20   during the course of a 24-hour day, the next will give him six,

21   and it's not a constant state.

22        Even more importantly, Your Honor, according to the ENT,

23   Dr. Brandeis, who did the tracheotomy, the most important

24   thing -- because this is a hole in his neck which goes directly

25   into his upper respiratory system -- is that the tracheotomy

1   and the supporting mechanism, which is the tube and the

2   internal plug, for lack of a better term, that goes into the

3   hole and everything else that the Court can take judicial

4   notice of has to be kept as clean as possible.

5       The tracheotomy equipment has to be cleaned daily with

6   peroxide.  In the 12 days that he has been at the Wayne County

7   Jail they haven't given him peroxide once.  He's supposed to

8   clean it with the sterile package that he gets as part of the

9   prescribed treatment.  He hasn't had a sterile package at the

10  Wayne County Jail at all.

11      He's sharing a room in the Wayne County infirmary with a

12  gentleman who has a colostomy bag, Your Honor, and the only way

13  that he can clean his tracheotomy equipment is to wash the

14  stuff in the exact same sink that his roommate uses.  So the

15  risk of infection is extremely high, and with that hole in his

16  neck it goes right into his upper respiratory system and his

17  lungs, and Dr. Brandeis is very concerned that there will be

18  severe complications if the tracheotomy is not cared for

19  properly, such as infections of the neck, chest and lungs.

20      In looking at the specific statutory criteria, in

21  rebutting a presumption of danger to the society, the Court can

22  take into consideration specifically someone's physical and

23  mental condition, and the physical condition here puts him at

24  great risk, since they can't take care of him the way that it's

25  supposed to be done, disease and/or early death for Mr. Darrah.

*11-20066-2; U.S.A. v. Darrah*

1          The Government believes that it has an extremely strong

2     case against Mr. Darrah.  With all due respect, that's

3     Mr. Straus' position, but quite frankly, Mr. Darrah has been

4     under the eyes of the Federal Government since 2009.  The last

5     taped, wire-tapped Title III transcript that we have that is

6     relied on by Mr. Straus took place in 2008.

7                    **THE COURT:**  When did he have his tracheotomy?

8               **MS. MACERONI:**  2007.  If he is such a danger to the

9     community, Judge, he's been out since 2009 when the complaint

10    was dismissed.  There's been no allegations of any violent or

11    criminal activity since then.

12         His prior history is reflected in the Pretrial Services

13    Report, and Mr. Straus' proffer is he had two misdemeanor

14    convictions in the 1990's.  The last one was in 1997 for

15    possession of marijuana.  No violent criminal history

16    whatsoever, no felony convictions whatsoever.

17         You know, there are certain, and Judge Whalen went through

18    quite an extensive list of, restrictions based on him to make

19    sure that he does not engage in any type of dangerous conduct

20    to the society and he's not a risk of flight and would allow,

21    balancing that, allowing him to continue in this continuous,

22    monitored medical care so that his physical condition does not

23    deteriorate any farther.  So based on that --

24                    **THE COURT:**  Has there been any deterioration of his

25    physical situation in the last ten or twelve days?

*Appeal of Bond Order Hearing*
*Monday, July 23, 2012*
                                                                    18

1        **MS. MACERONI:**  Well, he can't suction out the trach

2   because he has no -- he's supposed to suction out the trach and

3   the tube, and -- I'm going to use the term again because I

4   don't know -- the plug on a daily basis.  They have only been

5   able to give him access to a suction machine once every other

6   day.  So he's continually getting congested, and his breathing

7   is getting worse.  From what he tells me yesterday when I saw

8   him at the jail, his breathing is getting much worse.

9        He's also been prescribed two different nebulizers or

10  inhalers with prescription medications to help keep his lungs

11  clean as well as to act as an antibiotic, and they are detailed

12  in Exhibit 1, so that it cuts down on the risk of infection,

13  even when he's at home taking care of his machine and his trach

14  the way he's supposed to do.  He has absolutely no access

15  whatsoever to those prescribed antibiotic nebulizers.  That was

16  part of the 14 that I referred to earlier that the jail just

17  doesn't have.  The jail doesn't have peroxide that they can

18  give him.  They certainly are not equipped to give him the

19  nebulizers with the antibiotic solution in there to keep his

20  lungs clean.  So he has gotten much more congested in the

21  twelve days since he's been incarcerated.

22       He's greatly concerned about the state of the equipment

23  itself because the tubing and everything needs to be replaced

24  every 30 days just because of the constant wear and tear.  He

25  is completely out of air on one tank, and he's been

*11-20066-2; U.S.A. v. Darrah*

*Appeal of Bond Order Hearing*
*Monday, July 23, 2012*

19

1    replenishing the other tank as much as he can, but again,

2    supplies are limited with what the jail can offer, along with

3    the rate of the risk of infection.

4        So the antibiotic that he was on when he came into the

5    jail twelve days ago is gone, and he was told by the jail it is

6    not going to be replaced unless he spikes a fever or does

7    something else.  So that preventative piece of medication is

8    now no longer there.

9        **THE COURT:**  It's a different doctor's review of the

10   necessity of the situation, I take it.  When you say "the jail

11   said no replacement," you mean a physician in the employment, I

12   would imagine, of Wayne County?

13       **MS. MACERONI:**  The only person that I have been able

14   to talk to, quite frankly, is the head nurse.  That's what

15   she's telling me.  I have not talked to a physician at all, so

16   I'm not sure of the hierarchy of the medical, of the medical

17   department over there.  This is just what she's telling me is

18   available at the jail.

19       **THE COURT:**  So he has these physical ailments and

20   circumstances.  What else?

21       Mr. Straus, do you accept all of those statements

22   proffered by counsel?

23       **MR. STRAUS:**  I have no reason to dispute those,

24   Your Honor.

25       **THE COURT:**  All right.

1          **MR. STRAUS:**  Other than just to make the comment the

2     Agent, apparently during numerous FBI surveillances between

3     2008 and today's date, I don't think anyone has ever observed

4     Mr. Darrah using an oxygen tank, for whatever that's worth.

5          **MS. MACERONI:**  Judge, I would object to any new

6     evidence coming into today's hearing, especially notes passed

7     back and forth.  I mean, I agreed downstairs --

8          **THE COURT:**  That isn't the basis for an objection.

9          **MS. MACERONI:**  Well, Your Honor, I think it is.  I

10    mean, this is an appeal of a record that was made downstairs,

11    and I agreed --

12         **THE COURT:**  It's a de novo determination.

13         **MS. MACERONI:**  Well, I agreed downstairs to the

14    written proffer so that the agent would not have to go up and

15    testify on the stand.  If he's going to be asserting new

16    testimony here, then, you know, I just think that that's not

17    appropriate, and I would like the objection noted.

18         **THE COURT:**  It's noted, but I don't agree with it.

19    This is a de novo determination, and the parties can present

20    testimony, documents, proffers, whatever they may decide as far

21    as I'm concerned.

22         **MS. MACERONI:**  My response to that would be then as

23    an offer of proof, ever since I have met Mr. Darrah in 2009, he

24    has always had his oxygen tank, I mean that's just -- and the

25    medical records support that.

 1          **THE COURT:**  Okay.

 2          **MS. MACERONI:**  His medical condition -- my review of

 3    the risk of flight analysis is completely opposite to

 4    Mr. Straus'.  I mean, you know, if he was going to run, he

 5    would have run by now, very strong family support, and the

 6    medical condition also does not make him a very good risk of

 7    flight because there's no way he can get the medical treatment

 8    that he needs, you know, living in Motel 6's based on just how

 9    stringent he has to be with sterilization and taking care of

10    his medical complaints.

11          **THE COURT:**  All right.  Is that it?

12          **MS. MACERONI:**  That's it, Your Honor.

13          **THE COURT:**  All right.  Thank you.

14      Mr. Straus, anything final?

15          **MR. STRAUS:**  Just briefly.

16      It strikes the Government that the -- and I'm not well

17    versed in any of these medical conditions, but I did not hear

18    anything suggesting that these types of things could not be

19    taken care of in an appropriate medical facility within the

20    prison system, one, and I think that's key.

21      Also, again, Mr. Darrah was charged with a four-year

22    felony and the complaint was dismissed.  That was then.  This

23    is now.  He's charged with an overwhelming number of

24    significant charges, and even if we were to credit the

25    statement, and I have no reason to doubt the statement, that

*11-20066-2; U.S.A. v. Darrah*

1    somehow -- made back in 2009 by A.U.S.A. Schneider that the

2    DDMC is going down, it strikes the Government that, as we sit

3    here today, Mr. Darrah is the national vice president.  There

4    was no indication that after that statement he saw the error of

5    his ways and left the DDMC even after being notified, and the

6    indictment certainly does not suggest that post-2009 the DDMC

7    became a benevolent riders' club as opposed to an outlaw

8    motorcycle club.

9         His willingness to remain in that particular position,

10   leadership position, I think is of some significance even when

11   relayed to him that charges would -- more significant charges

12   would be coming down and perhaps is indicative of the attitude

13   that members of this criminal organization have towards law

14   enforcement, and perhaps they are confidence that they can

15   thwart efforts, based on their prior history, against them.

16        So, with that, I have nothing further, Your Honor.

17        **THE COURT:**  The case is a presumption, there's no

18   dispute about that, Ms. Maceroni, is there?

19        **MS. MACERONI:**  No, Your Honor.

20        **THE COURT:**  It's a presumption case.  The combination

21   of charges here and the ten-year mandatory minimum upon

22   conviction for at least one, if not more than one, of the

23   offenses, the combination of offenses that add up to a, upon

24   proffer at least, 30 years to life recommended sentencing range

25   is a circumstance that is considerably different than what was

1   faced earlier when A.U.S.A. Schneider was in charge apparently

2   of communicating these things to the defendant through counsel.

3   He was facing a four-year felony, and faces -- I haven't even

4   counted them -- I don't know how many counts of the indictment,

5   numerous, at least a dozen, if not more, in which he is charged

6   with the collection of charges adding up to a mandatory minimum

7   of 30 to life likely the guideline range.  The defendant's

8   flight risk is heightened beyond what would be indicated in the

9   presumption of detention case.

10      The bond statute requires the Court to begin with the

11  presumption that there are no conditions or combinations of

12  conditions that might reasonably assure the appearance of the

13  individual and safety of the community or of any other person.

14  The nature of the allegations as proffered and, again, as in

15  the indictment with respect to overt act allegations, manner

16  and means of the conspiracy, indicate that the defendant was

17  individually involved in numerous instances of threats of

18  bodily harm, threats up to, and perhaps even including, threats

19  to kill one or more other individuals for a violation of club

20  rules and protocols.  The indictment speaks in numerous places

21  of fairly brutal violence being visited upon various members or

22  associates of the club.

23      The Court is very concerned about danger to the community,

24  danger to individuals, and the heightened risk of flight in

25  spite of the defendant's medical condition, which I'm not sure

 1    how dire it is.  Numerous medications are prescribed or have

 2    been prescribed apparently, but those are matters that are

 3    commonly taken care of in a custodial setting.  He may not be

 4    getting the exact dosages and details that perhaps were

 5    prescribed by a private physician, but the prison system and

 6    the contract detention facilities are equipped, according to

 7    the information that I have, consistent information that I

 8    have, to deal with troublesome medical circumstances, and I do

 9    not think that a tracheotomy and the array of medications that

10    are required weighs particularly heavily in the balance of

11    whether the defendant presents a danger to the community.

12         That leads to a risk of flight.  At the very least, I

13    think he does present the risk of flight.  In fact, the

14    presumption amplifies that.  I think he does present a danger

15    to the community on the details proffered by Government

16    counsel, the details of which, by the way, have not been

17    substantially rebutted or contested.  The indictment speaks for

18    itself.  The grand jury heard the evidence and voted upon those

19    details, as it is suggested in the overt acts and the manner

20    and means.

21         To me the danger is evident and the presumption prevails.

22    There has not been a showing that inclines the Court to think

23    any differently.  I don't shift the burden formally to the

24    defendant in that regard.  I consider the whole of the

25    situation with the presumption in mind as the starting point of

*Appeal of Bond Order Hearing*
*Monday, July 23, 2012*                                    25

1    the analysis.  I don't think it's much more than that, at least

2    it will not be for this determination.

3         But my decision is nonetheless that there are no

4    conditions or combination of conditions that will reasonably

5    assure the safety of any other person or the community or

6    ensure the appearance of the person if he were released upon

7    such conditions.  So the defendant is ordered detained pending

8    further order of the Court.

9                              -    -    -

10                    **C E R T I F I C A T I O N**

11        I certify that the foregoing is a correct transcription of

12   the record of proceedings in the above-entitled matter.

13

14   s/ Sheri K. Ward_____            August 23, 2012
     Sheri K. Ward                       Date
15   Official Court Reporter

16                              -    -    -

17

18

19

20

21

22

23

24

25

*11-20066-2; U.S.A. v. Darrah*